ALTENBERND, Judge.
The Brunos, who own fifty percent of the stock of Elephant Industries, Inc., appeal an order granting a summary judgment which declares that Fleet Credit Corporation has a perfected security interest in certain accounts receivable and other property belonging to Elephant Industries. The order also authorizes the sale of this collateral to satisfy Elephant Industries’ obligation to Fleet under an equipment lease. Although the order has been appealed as a final order, we accept jurisdiction under Florida Rule of Appellate Procedure 9.130(a)(3)(C)(iv) since the order determines liability in favor of a party seeking affirmative relief. We affirm the order because Fleet was legally entitled to secure Elephant Industries’ payments on the equipment lease through a security interest in the accounts receivable and other collateral. The fact that Fleet had also filed certain separate financing statements to record its ownership of the leased equipment does not alter this result.
On October 16, 1986, Elephant Industries entered into a master equipment lease with Fleet. Under the lease, Fleet provided various items of machinery which Elephant Industries used in its manufacturing business. This master lease had a term of forty-eight months and monthly payments of $7,264. Shortly after the execution of the master lease, two supplemental leases were executed to add equipment to the lease.
In conjunction with the master lease, Elephant Industries executed several security agreements and Uniform Commercial Code Form UCC-1 financing statements. Two of the security agreements are entitled “Security Agreement for Lease Payments (Equipment).” These agreements describe Elephant Industries’ leased equipment. Elephant Industries also signed and filed financing statements describing the leased equipment and stating that the equipment is owned by Fleet and in Elephant Industries’ possession under a true lease. The master lease states: “Any such filing or recording shall not be deemed evidence of any intent to create a security interest un *600 der the Uniform Commercial Code.” As to the leased equipment,-it is clear that Fleet was the owner under a true lease and not a secured creditor. See § 671.201(37), Fla. Stat. (1985).
In addition to these agreements, Elephant Industries executed another security agreement entitled “Security Agreement for Lease Payments (Receivables and Inventory).” This agreement specifies that Fleet has a security interest in Elephant Industries’ accounts receivable, inventory, and other collateral to protect the payments owing under the master lease. Elephant Industries also signed and filed a financing statement describing this collateral. As to the accounts receivable, inventory, and other collateral pledged by this agreement, it is clear that Fleet was a secured creditor rather than an owner under a lease.
In April 1988, Elephant Industries failed to make the payments due under the master lease. Because of this default, Elephant Industries owed Fleet $286,000 with accruing interest. Fleet took possession of its equipment and sold it, as it was entitled to do under the lease. The sale of the equipment netted only $138,000 and, thus, created an outstanding deficiency of approximately $160,000 due Fleet. This deficiency was not satisfied, and the financing statements describing the accounts receivable and other collateral remained of record.
After the equipment had been repossessed and sold, Elephant Industries obtained a loan from Naples Federal Savings and Loan Association. This loan was also secured by Elephant Industries’ accounts receivable and other collateral. The financing statement of Naples Federal was filed subsequent to Fleet’s filing.
The Brunos purchased Elephant Industries’ loan from Naples Federal and took an assignment of its rights against Elephant Industries. Apparently, the Brunos purchased this loan in the belief that Fleet’s documents were insufficient to create an enforceable, perfected security interest in the accounts receivable and other collateral which would be superior to the rights of Naples Federal. Their belief was mistaken.
Elephant Industries had leased valuable equipment. If it had misused the equipment, failed to make the payments, or otherwise defaulted on the lease, there would have been a substantial risk that Elephant Industries would owe Fleet a sizable obligation which could exceed the value of the leased equipment. Just as a landlord typically requires a security deposit in a real estate lease, Fleet obtained security for its exposure on the equipment lease.
In order for Fleet’s security interest to be enforceable under the UCC, Elephant Industries needed to sign a security agreement describing the collateral in which it had rights, and it needed to receive “value” from Fleet. § 679.203(1), Fla.Stat. (1985). Elephant Industries signed a security agreement which described the accounts receivable and other collateral and stated that it was signed to secure obligations under the master lease. For purposes of the UCC, “value” is broadly defined to include “any consideration sufficient to support a simple contract.” § 671.201(44)(d), Fla.Stat. (1985). The benefits which Elephant Industries received under the master lease are consideration which would support a simple contract and, consequently, do support this security interest.
The Brunos extensively argue that Fleet cannot obtain both a lease interest and a security interest in property through the security agreements and financing statements. Although it may be true that Fleet cannot be both an exclusive owner and a secured creditor concerning the leased equipment, there is nothing in the statutes or in logic which prevents Fleet from receiving a security interest in one property, i.e., the accounts receivable, to protect its ownership interest in another property, i.e., the leased equipment.
Affirmed.
SCHOONOVER, C.J., and SCHEB, J., concur.